IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 06-377 |
| | : | |
| CHARLES WHITE, ET AL. | : | |

**SURRICK, J.**                                                                           **JANUARY 2 , 2013**

**MEMORANDUM**

Presently before the Court are Defendants Charles White, Allen Smith, Michael Merin, Antoine Norman, and Akintunde Crawford's Post-Restitution Hearing and Sentencing Memoranda (ECF Nos. 490, 492-495) and the Government's Supplemental Sentencing Memorandum Regarding Number of Victims (ECF No. 491). For the following reasons, the Court finds that Defendants' offenses involved ten or more victims and the sentencing enhancement Section 2B1.1(b)(2)(A) of the United States Sentencing Guidelines ("U.S.S.G.") applies.

**I. BACKGROUND**

On July 26, 2006, the grand jury returned an indictment charging Defendants Charles White, Allen Smith, Michael Merin, Antoine Norman, Akintunde Crawford, and Kevin Norris with conspiracy to commit bank fraud and aggravated identity theft and substantive acts of bank fraud and aggravated identity theft. Defendants White, Smith, Merin, and Norman were also charged with executing or attempting to execute a scheme to defraud Commerce Bank. Defendants White, Smith, Norman, and Crawford were also charged with executing or

attempting to execute a scheme to defraud M&T Bank, PNC Bank, and Wachovia Bank. Defendants White, Merin, Norman, Crawford, Smith, and Norris were also charged, in seventeen separate counts (not all Defendants were charged in each count), with knowingly and without lawful authority possessing and using a means of identification of another person. On September 7, 2007, following a jury trial, Defendants were found guilty on various counts.

At the sentencing hearing, several enhancements were applied to Defendants' offense levels. These included a fourteen-level enhancement, pursuant to U.S.S.G. § 2B1.1(b)(1), for an offense involving a loss exceeding $400,000, a four-level enhancement, pursuant to U.S.S.G. § 2B1.1(b)(2), for an offense involving at least fifty victims, and a two-level enhancement, pursuant to U.S.S.G. § 2B1.1(b)(10), for an offense involving sophisticated means.[1] Defendants appealed the convictions and sentences. (*See* ECF Nos. 267, 319, 329, 336, 356.) The Third Circuit Court of Appeals affirmed Defendants' judgments of conviction and vacated the sentences imposed. (*See* Judgment of Court of Appeals, ECF No. 442.)

On appeal, the Third Circuit remanded the case based upon its decision in *United States v. Kennedy*, 554 F.3d 415, 419 (3d Cir. 2009). *Kennedy* clarified the definition of the term "victims" under § 2B1.1(b)(2) of the Sentencing Guidelines. *United States v. Norman*, 465 F. App'x 110, 121 (3d Cir. 2012). The Third Circuit specifically left it to the discretion of the Court whether to permit the introduction of additional evidence at the sentencing hearing. *Id.* On November 2, 2012, a hearing was held to allow all parties to offer evidence to assist the Court in determining the number of victims pursuant to U.S.S.G. § 2B1.1(b)(2). (Min. Entry, ECF No.

---

[1] The factual background of this case is more fully set forth in our Memorandum regarding the loss amount to be attributed to the five Defendants. *See United States v. White*, No. 06-377, 2008 WL 4191736 (E.D. Pa. Sept. 8, 2008).

485.)

At the November 2, 2012 hearing, the Government presented three witness: Marion Marcuggi; Elaine Ford; and United States Postal Inspector Thomas Ninan. (*See* Nov. 2, 2012 Hr'g Tr. (on file with Court).) Marcuggi, a victim of Defendants' fraud, had testified at trial. (*Id.* at 10.) Ford, who had been identified in discovery materials under her prior name (Elaine Kane), had not testified at trial in light of her responsibilities as a single mother of three, including a child with significant health issues. (*Id.* at 27, 33.) Thomas Ninan is a United States Postal Inspector. (*Id.* at 54.) In 2010, three years after trial, and approximately two years prior to the Third Circuit's decision in *Norman*, Ninan became the case agent for this matter. (*Id.*) Inspector Ninan testified with regard to interviews that he conducted with individual account holders prior to the hearing. (*Id.* at 55.) In conjunction with Inspector Ninan's testimony, the Government introduced victim-impact statements from five individuals. (*See* Gov't's Exs. G-1—G-5 (on file with Court).)

We directed the parties to submit supplemental briefing on the various procedural and substantive issues related to the hearing on the applicability of U.S.S.G. § 2B1.1(b)(2). On November 19, 2012, Defendants and the Government filed supplemental memoranda. (*See* Crawford Mem., ECF No. 490; Gov't's Mem., ECF No. 491; Norman Mem., ECF No. 492; White Mem., ECF No. 493; Smith Mem., ECF No. 494; Merin Mem., ECF No. 495.)

## II. LEGAL ANALYSIS

Defendants raise two issues for our consideration. First, Defendants contend that they were prejudiced and that the Court abused its discretion by permitting additional witness testimony at the November 2, 2012 hearing. Second, Defendants argue that the evidence

3

uncovered during the evidentiary hearing does not support the application of the sentencing enhancement under U.S.S.G. § 2B1.1(b)(2)(A). The Government responds that the type and form of the evidence presented by the Government was proper and sufficient to establish that there were ten or more victims under § 2B1.1(b)(2)(A).

### A. Prejudice to Defendants

#### 1. *Introduction of Additional Evidence*

Defendants argue that the Court abused its discretion when it permitted the Government to supplement the record with regard to evidence of other potential victims. (White Mem. 3; Smith Mem. 2.) Defendants contend that the Government was always aware that it was required to present evidence establishing the number of victims if it intended to avail itself of the sentencing enhancement in U.S.S.G. § 2B1.1(b). (White Mem. 3-4.)

In its opinion remanding the case, the Third Circuit stated "we will leave it to the District Court's discretion as to whether to allow additional evidence." *Norman*, 465 F. App'x at 121. The court cited *United States v. Coward*, 296 F.3d 176, 180 (3d Cir. 2002). In *Coward*, the Third Circuit found that the Government neglected to introduce readily available evidence "out of a faulty interpretation of the law." *Id.* at 182. In remanding the case to the district court, the court explained: "[c]onsideration should be given to whether the law on point at the time was unclear or ambiguous, as well as to whether new evidence came to light after the proceedings closed." *Id.* The court further acknowledged that "'[w]hen faced with a motion to reopen, the district court's primary focus should be on whether the party opposing reopening would be prejudiced if reopening is permitted.'" *Id.* at 181 (quoting *United States v. Kithcart*, 218 F.3d 213, 220 (3d Cir. 2000)).

4

Defendants contend that the Government has failed to satisfy the requirement in *Coward* that the party seeking to reopen a hearing provide good cause as to why the evidence was not introduced at an earlier proceeding. (Smith Mem. 3; Nov. 2 Hr'g Tr. 5-8.) In addition, Defendants argue that because "the law in various [c]ircuits was clear . . . there was absolutely no reason for the Government's failure to present the evidence earlier." (White Mem. 4.) Defendants' position is untenable.

Sentencing hearings were held for White and Norman on September 9, 2008 (Min. Entries, ECF Nos. 321, 323), for Smith on September 17, 2008 (Min. Entry, ECF No. 333), for Crawford on November 19, 2008 (Min. Entry, ECF No. 360),[2] and for Merin on December 15, 2008 (Min. Entry, ECF No. 370). These sentencing determinations and the hearings that preceded them occurred before the Third Circuit's decision in *Kennedy*, which was filed on February 4, 2009. As the Third Circuit acknowledged when remanding the case, "[a]t the time of sentencing, however, this Court had yet to address the issue, and the District Court accepted the government's theory that temporary losses could constitute actual loss." *Norman*, 465 F. App'x at 121. Moreover, at the November 2, 2012 hearing, the Government articulated a reasonable explanation for why it failed to present the disputed evidence during its case-in-chief:

> [T]he legal landscape has changed since the time of the sentences in that the *Kennedy* case was decided after the sentencing hearings and the legal issue is therefore different. Before the *Kennedy* case, the Third Circuit . . . had not spoken as to whether temporary losses from an individual account holder's account could qualify for the victim enhancement under the guidelines. After the sentencings, the Third Circuit decided that issue and said that temporary losses by themselves could not qualify a person as a victim; however, other types of evidence could, and that's why we think it's appropriate today we be permitted, given the new legal landscape after

---

[2] Crawford was originally sentenced on November 13, 2008. (*See* Min. Entry, ECF No. 357.) The Court reimposed his sentence due to a clerical error.

the Third Circuit's decision in Kennedy, to present that additional evidence. (Nov. 2 Hr'g Tr. 9); *see United States v. Bell*, 418 F. App'x 115, 118 (3d Cir. 2011) (finding district court's decision to reopen proceedings proper in light of government's reasonable explanation); *United States v. Hart*, No. 02-823, 2008 WL 1900145, at *15 (E.D. Pa. Apr. 28, 2008) (finding no prejudice to defendant by reopening the record after the close of evidence to allow the Government to admit two previously authenticated Government exhibits). Based on the Government's argument and the uncertainty of the law surrounding Section 2B1.1(b)(2) prior to the Third Circuit's decision in *Kennedy*, we determined that it was appropriate to allow the parties to supplement the record at the November 2, 2012 hearing.

The decision to reopen hearings to supplement the record is also predicated on "the character of the testimony and the effect of the granting of the motion. The evidence proffered should be relevant, admissible, [and] technically adequate . . . ." *United States v. Keyes*, 214 F. App'x 145, 153 (3d Cir. 2007) (citing *Coward*, 296 F.3d at 181). Defendants claim that they were prejudiced by the witness statements introduced by the Government. They contend that the statements violated Defendants' due process rights because they were not provided until October 31 and November 1, 2012, and that the hearing occurred on November 2, 2012. (Smith Mem. 9.) In addition, Defendants claim that they were prejudiced because the witnesses that either testified at the hearing or provided victim impact statements did not testify at trial. (White Mem. 6.)[3] The Government responds that they provided Defendants with Inspector Ninan's notes from his interview with Ponzio pursuant to Federal Rules of Criminal Procedure 26.2(a) and 32(i)(2).

---

[3] Ford did not testify at trial. As White concedes, this was for good cause. (*See* White Mem. 2 n.1.)

(Gov't's Mem. 6 n.2.) The Government also contends that victim impact statements are not covered by Rule 26.2, but notes that these statements were given to Defendants prior to the hearing anyway. (*Id.*) Furthermore, the Government maintains that each account holder interviewed by Inspector Ninan was referenced in the Indictment and was equally accessible to Defendants. (*Id.*)

Federal Rule of Criminal Procedure 32 and the Sentencing Guidelines contemplate that district courts will hear testimony at sentencing. *See* Fed R. Crim. P. 32(i)(2) ("The court may permit the parties to introduce evidence on the objections. If a witness testifies at sentencing, Rule 26.2(a)-(d) and (f) applies."); U.S.S.G. § 6A1.3(a) ("When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor."). Discovery rules are relaxed for sentencing proceedings. *See United States v. O'Donnell*, No. 84-110, 1988 WL 52090, at *3 (E.D. Pa. May 18, 1988) ("All that is required is that the defendant be given, at the sentencing hearing, a reasonable opportunity of rebuttal."); *United States v. Ihlenfeld*, No. 85-90, 1987 WL 18862, at *3 (E.D. Pa. Oct. 23, 1987) (same); *United States v. Agyemang*, 876 F.2d 1264, 1270 (7th Cir. 1989).

In *United States v. Jackson*, 649 F.2d 967 (3d Cir. 1981), the Third Circuit addressed concerns similar to those voiced by Defendants. The *Jackson* court found no due process violation where evidence introduced at the sentencing hearing had not been disclosed to the defendant prior to the hearing reasoning that "[defendant] cites no precedent, and we know of none, for the proposition that due process requires that such notice be provided by the government in advance of a sentencing hearing." *Id.* at 979.

7

Courts have required pre-hearing disclosure of the documents on which the Government will rely at a sentencing hearing in certain circumstances. *See United States v. Nappi*, 243 F.3d 758, 763-64 (3d Cir. 2001) ("[W]e hold that where, as here, counsel are faced with having to review and address the contents of an additional document on which the Court intends to rely at sentencing, a meaningful opportunity to comment requires the Court, in accordance with Rule 32(c)(1), to provide a copy of the document to counsel for the defendant and the government within a sufficient time prior to the sentencing hearing to afford them with a meaningful opportunity to comment on it at sentencing and, depending on the document, prepare a response or contest it."). In *Nappi*, the Third Circuit stopped short of adopting a rigid rule of discovery for sentencing hearings, observing that "we do not foreclose the possibility that it would be sufficient prehearing disclosure under Rule 32(c)(1) if the Court shared the documents with defense counsel on the date of the scheduled sentencing hearing, if the circumstances warranted that procedure." *Id.* at 765. Following *Nappi*, the Third Circuit reiterated that "[n]either the Supreme Court nor this one have held that the Due Process Clause entitles a defendant to advance notice of the information upon which he or she will be sentenced or to comment meaningfully on that evidence." *United States v. Reynoso*, 254 F.3d 467, 473 (3d Cir. 2001).

As the Rules permit and as the Third Circuit left to our discretion, we permitted the parties to introduce additional evidence with respect to the number of victims of Defendants' fraud. The Government's offering of witnesses and victim impact statements at the hearing and disclosing those statements in the days before the hearing did not violate Defendants' due process rights. Defendants were well-aware of the nature of the November 2, 2012 hearing. The case was remanded by the Third Circuit for the very purpose of re-sentencing in light of the court's

recent decision in *Kennedy*. In its opinion, the Third Circuit expressly left open the option of additional evidence. *Norman*, 465 F. App'x at 121. The nature of the hearing should not have come as a surprise to Defendants. In addition, if Defendants wanted to interview the account holders in anticipation of our hearing on the victim analysis of Section 2B1.1(b)(2), they were free to do so. They could have requested a continuance of the hearing for that purpose. They chose not to.

Finally, we note that *Nappi* is easily distinguished from the instant matter. In *Nappi*, the Third Circuit held that a district court had violated Rule 32 by consulting and relying upon a Pre-Sentence Investigation Report prepared pursuant to an earlier state court case without providing the Government or defendant advance notice of its intentions to do so. *Nappi*, 243 F.3d at 768. Here, the Pre-Sentence Investigation Report is not at issue. Instead, the documents forming the basis of Defendants' due process argument are the victim impact statements, which were disclosed to Defendants one or two days before the hearing. (Smith Mem. 9-10.)[4] Despite the fact that the disclosure occurred close in time to the hearing, the Government did, in fact, provide Defendants with more than they were entitled to pursuant to the Federal Rules of Criminal Procedure. Moreover, the information provided in the victim impact statements and in the testimony of the victims is not the type of evidence that would require extensive investigation by Defendants. Any victim in an identity theft would be expected to drive to the bank or the police station to obtain more information about the fraud or to get help from law enforcement.

---

[4] In addition, Inspector Ninan testified that he intended to conduct interviews with the account holders on Monday, October 29, 2012, but that these efforts were interrupted by Hurricane Sandy. (Nov. 2 Hr'g Tr. 77.) The storm also impacted the ability of Ponzio to testify, which was an unavoidable issue for which the Government is not responsible.

Defendants also contend that "witnesses seemed to have 'gotten their stories straight'" for the hearing. (White Mem. 5.) In essence, Defendants suggest that it was convenient that witnesses all claimed to have spent time and money investigating the fraud prior to being reimbursed. (*Id.*) Defendant argues that the consistency of the witnesses' testimony is especially noteworthy because Inspector Ninan was the only individual present with them. (*Id.* at 6.) It is hardly surprising that account holders were asked by the case agent about collateral financial losses and time spent investigating the fraud. The entire purpose of the November 2, 2012 hearing was to supplement the record with information from individual account holders related to potential losses that might render them victims under § 2B1.1(b)(2). Inspector Ninan's testimony about the questions he asked the account holders does not reflect leading or suggestive questioning. (Nov. 2 Hr'g Tr. 76 ("I asked them what was the fraud in the case, to explain the fraud as they understood it and to explain how they went to the post office, the police station, and the banks.").) While the account holders' responses may be unfavorable for Defendants, we reject the threadbare allegations that they were arranged in concert.

    2.    *Nature of Hearing*

Defendants contend that the November 2, 2012 hearing was an evidentiary hearing rather than a sentencing hearing. (White Mem. 7.) As such, Defendants contend that permitting Inspector Ninan to testify about interviews with individual account holders and statements the individuals made was a violation of Defendants' rights under the Confrontation Clause. (Merin Mot. 2; White Mem. 6-7; Smith Mem. 7.) In the alternative, Defendants argue that if the November 2, 2012 hearing was part of the sentencing hearing, Inspector Ninan's testimony did not bear sufficient indicia of reliability, as Inspector Ninan was the only other party present

during the questioning and no notes were taken. (White Mem. 6-7.) Defendants argue that the evidence adduced from the account holders was testimonial hearsay. (*Id.* at 7.) The Government responds that Defendants were not entitled to cross-examine witnesses at the November 2, 2012 hearing and that Inspector Ninan's testimony was sufficiently reliable.

The November 2, 2012 hearing was a sentencing hearing. Even though the final sentencing of each Defendant has been scheduled on separate dates, the November 2 hearing was scheduled in order to allow the parties to develop evidence in aid of our sentencing determination.

Pursuant to the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. Until recent years, an unavailable witness' out-of-court statements were admissible insofar as they had adequate "indicia of reliability," which meant that they fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). In *Crawford v. Washington*, 541 U.S. 36, 53 (2004), the Supreme Court found that the Sixth Amendment was primarily concerned with "testimonial hearsay," i.e., testimony at a preliminary hearing, in front of a grand jury, or at a prior trial, and statements made during police interrogations. To admit testimonial hearsay into evidence, the Sixth Amendment requires that the declarant be unavailable and that the accused have had a prior opportunity for cross-examination. *Id.* at 59. Since we are dealing here with a sentencing hearing, the issue is whether the Confrontation Clause even applies. As the Third Circuit made clear in *United States v. Robinson*, 482 F.3d 244, 246 (3d Cir. 2007), "[t]he law on this issue is well settled. Both the Supreme Court and this Court of Appeals have determined that the Confrontation Clause does

11

not apply in the sentencing context and does not prevent the introduction of hearsay testimony at a sentencing hearing."

"The admission of hearsay statements in the sentencing context is subject to the requirements of the Due Process Clause. Under the precedent of this court, hearsay statements must have some 'minimal indicium of reliability beyond mere allegation.'" *Robinson*, 482 F.3d at 246 (quoting *United States v. Kikumura*, 918 F.2d 1084, 1102 (3d Cir. 1990)); *see also* U.S.S.G. § 6A1.3(a) ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."); *United States v. O'Garro*, 280 F. App'x 220, 225 n.4 (3d Cir. 2008) ("Our precedent is clear: hearsay may indeed be admitted at the sentencing stage of a case . . . .").

Inspector Ninan testified that he not only collected the victim impact statements from five account holders, but also spoke to them about the series of events underlying the fraud and their reactions. (Nov. 2 Hr'g Tr. 57, 60-62.) He was present when their statements were written. (*Id.* at 73.) Although Inspector Ninan did not collect a victim impact statement from Ponzio, he spoke to her on several occasions. (*Id.* at 63-64.) Ponzio did not provide a written statement because she intended to testify at the November 2, 2012 hearing, but was unable to do so in light of issues related to Hurricane Sandy. (*Id.* at 64.) The evidence presented was of the type routinely relied upon by courts in sentencing hearings. *See, e.g.*, *United States v. Clark*, 335 F. App'x 181, 184 (3d Cir. 2009) (finding that victim impact statements had sufficient indicia of reliability for admission during sentencing proceeding); *United States v. Leekins*, 493 F.3d 143, 149-50 (3d Cir. 2007) (admitting unverified police report into evidence at sentencing hearing

12

even though officers who prepared the report did not testify at the hearing); *United States v. Little*, 308 F. App'x 633, 636 (3d Cir. 2009) (finding proper district court's admission into evidence of hearsay testimony of witness about the contents of bank records and victims' reports).

Inspector Ninan's testimony was credible. Accordingly, we find that the evidence introduced by the Government at the sentencing hearing was sufficiently reliable.

**B.     Applicability of § 2B1.1(b)(2)**

Under Section 2B1.1(b)(2)(A) of the Sentencing Guidelines, a court is to increase a defendant's [offense level] by two levels if the offense involved ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A). "Victim" is defined by the Guidelines as "any person who sustained any part of the actual loss . . . ." *See* U.S.S.G. § 2B1.1(b)(2), cmt. n.1. "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *See* cmt. n. 3(A)(i). "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in 'money'," and "does not include emotional distress, harm to reputation, or other non-economic harm." *Id.*

Neither party contests the finding that four banks – M&T Bank, Commerce Bank,[5] Wachovia Bank, and PNC Bank – suffered an actual loss measurable in money as a result of Defendants' scheme. (Norman Mem., 4; Crawford Mem. 10.) Thus, there are at least four "victims" in this case. In order to apply the Guidelines enhancement under Section 2B1.1(b)(2)(A), the Government must establish that there were ten or more victims. Accordingly, the remaining issue is whether the Government has proven, pursuant to *Kennedy*,

---

[5] Commerce Bank was acquired by TD Bank in 2008.

that the individuals who were defrauded but subsequently reimbursed in whole, were victims under the Guidelines.

In *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005), the Sixth Circuit Court of Appeals addressed the application of U.S.S.G. § 2B1.1(b)(2)(A). The court found that account holders wholly reimbursed after a fraud perpetrated using stolen checks, were not victims because the Government failed to establish "actual loss." *Id.* at 971. The court observed, however, that under Section 2B1.1(a)(2) "there may be situations in which a person could be considered a 'victim' under the Guidelines even though he or she is ultimately reimbursed . . . ." *Id.*

A number of circuits have availed themselves of this so-called "*Yagar* carve-out" and found that individual account holders were victims under U.S.S.G. § 2B1.1(b)(2) even though they were reimbursed because they suffered some additional harm. *See, e.g.*, *United States v. Panice*, 598 F.3d 426, 433 (7th Cir. 2010) ("In our view, the fact that the victims were eventually reimbursed does not negate their victim status."); s*ee also United States v. Armstead*, 552 F.3d 769 (9th Cir. 2008) (finding that courts must analyze loss calculation to determine if an account holder was a victim and that if reimbursement takes a longer period of time may amount to a pecuniary harm); *United States v. Abiodun*, 536 F.3d 162, 168-69 (2d Cir. 2008) (holding that individuals who are ultimately reimbursed are victims under U.S.S.G. § 2B1.1(b)(2) "if . . . they suffered (1) an adverse effect (2) as a result of the defendant's conduct that (3) can be measured in monetary terms").

In *United States v. Lee*, 427 F.3d 881, 894 (11th Cir. 2005), the Eleventh Circuit Court of Appeals found that, unlike in *Yagar*, account holders were not immediately reimbursed, suffered

foreclosures and other repossession processes to recoup losses, and had to engage in time-consuming efforts to ensure restitution from defendants rather than from third parties. They were, therefore, victims under U.S.S.G. § 2B1.1(b)(2).

Similarly, in *United States v. Pham*, 545 F.3d 712, 718 (9th Cir. 2008), the Ninth Circuit found that individual account holders may be victims pursuant to Section 2B1.1(b)(2) of the Guidelines where the individuals were forced to spend time, effort, and money before receiving reimbursement. In reaching this conclusion, the Ninth Circuit relied on a victim impact statement introduced at defendant's sentencing, which reflected a couple's "month of sleepless nights" and "several weeks [and] many emails and phone calls" until they were reimbursed the amount of the counterfeit checks and their account was unfrozen. *Id.* at 719. Moreover, the court reasoned that "[t]he sorts of costs set forth in the Victim Impact Statement and the other examples given by the government at [defendant's] sentencing . . . such as the cost of gas mileage for trips to and from banks and the cost of stamps and telephone calls, satisfy the Guidelines' definition of 'actual loss' because they are 'monetary' or 'readily measurable in money.'" *Id.* at 721 (citing U.S.S.G. § 2B1.1 cmt. n.3(A)(iii)). The court found, however, that the Government had not introduced sufficient evidence to satisfy its burden. *Id.* at 721-22.

In *Kennedy*, the Third Circuit considered whether the district court erred in finding that each of the thirty-four account holders, beneficiaries of the Social Security Administration, Department of Veterans Affairs, and Railroad Retirement Board, were victims. *Kennedy*, 554 F.3d at 417-19. In finding that the Government failed to meet its burden to prove that the account holders were victims pursuant to the Guidelines, the court found that the account holders had not suffered any pecuniary harm. *Id.* at 419 (citing U.S.S.G. § 2B1.1(b)(2), cmt. n.1, n.

15

3(A)(i)).  Recognizing the "*Yagar* carve-out," the court noted that "had the Government shown that the account holders that [defendant] defrauded spent time or money seeking reimbursement, this would be a closer case."  *Id.* at 422.  In addition, the court read *Lee*, *Pham*, *Armstead*, and *Abiodun* as extensions of *Yagar* rather than as a circuit split.  *Id.* at 420-21.  Finally, the court observed that it "expect[s] that district judges will examine the particular facts of each case in fashioning a just sentence without getting bogged down in formalistic technicalities."  *Id.* at 423.

A finding under the Sentencing Guidelines must be based on reliable information and a preponderance of the evidence.  *See* U.S.S.G. § 6A1.3; *United States v. Allen*, 434 F.3d 1166, 1173 (9th Cir. 2006); *Yagar*, 404 F.3d at 972.  Here, the Government provided evidence with regard to the additional harm of the individuals involved by way of testimony and victim impact statements.  Specifically, Marcuggi testified that she took multiple trips, including car rides to the bank and to the police station, prior to having been reimbursed by the bank.  (Nov. 2 Hr'g Tr. 23, 25.)  These trips required Marcuggi's time and money, by way of expenditures for gas.[6]  A second witness, Ford, testified that she spent three hours on the phone and during in-person meetings with her bank, PNC, and law enforcement officials.  (Nov. 2 Hr'g Tr. 31.)  After investigating issues with her account that were uncovered in April, and taking two trips to her bank, Ford was not reimbursed until May or June.  (*Id.* at 30, 38-39.)[7]

---

[6] Defendants argue, and the Court agrees, that Marcuggi, and the other account holders' post-restitution activities do not constitute "some additional harm" for the purposes of determining whether they were victims under § 2B1.1(b)(2).  (Crawford Mem. 3.)

[7] Defendants seek to minimize the impact of Ford's testimony by highlighting that her investigation involved steps she takes in the normal course of business.  (Smith Mem. 5; Crawford Mem. 3, 12.)  In fact, Ford's testimony reflects that she noticed irregularities in her account statements, underwent an investigation for a month, and assumed she had made a mistake.  (Nov. 2 Hr'g Tr. 38.)  Irrespective of Ford's mistaken belief at the time, it was

Inspector Ninan introduced victim impact statements for Sandra Posey, Arelis Diaz, Kim Cogswell, Angela Peffley, and Michelle Rosemarin. (*See* Gov't's Exs. G1—G5.) Posey's statement reflects that she spent time interacting with the branch manager at M&T Bank regarding an account over which she had power of attorney and was forced to visit the bank branch. (Gov't's Ex. G-1.) Because the Posey account was not reimbursed for four or five weeks, Posey had to visit M&T Bank again. (*Id.*) Diaz's statement reflects that she both called and visited her bank to inquire about irregularities with her account. (Gov't's Ex. G-2.) While the bank was investigating the fraud, Diaz indicated that she took measures of her own, including purchasing a shredder for $80. (*Id.*) Prior to being reimbursed months later, Diaz traveled to her bank, which was five miles away, once a week, and called the bank every day. (*Id.*) Diaz's statement indicates that she was able to take fewer vacation days than anticipated because of the investigation. (*Id.*) After being informed by the Commerce Bank Fraud Department that her account was closed and being advised to visit the bank, Cogswell was forced to take a vacation day from work to investigate the issue. (Gov't's Ex. G-3.) Cogswell drove to the bank, to the police station to file a report, and then back to her bank. (*Id.*) In total, she estimates that her involvement took approximately five hours and ten miles of driving. (*Id.*) Cogswell also purchased a shredder for $45 and contacted three credit rating agencies with regard to the fraud. (*Id.*)

Peffley's victim impact statement indicated that she realized that her bank account was overdrawn and took the rest of the day off from work. (Gov't's Ex. G-4.) The next day, she and

---

Defendants' fraudulent conduct that caused the irregularities leading to her expenditures of time and money to sort out her accounting issues.

her husband both took the day off from work to inquire about the situation. (*Id.*) While investigating the fraud, Peffley made three or four trips to her bank, requiring travel from New Jersey to Pennsylvania and back, paying for tolls and gas. (*Id.*) Peffley signed up for a credit watch service, which cost $50. (*Id.*) Rosemarin was informed by Commerce Bank that she had issued two bad checks totaling $1,500. (Gov't's Ex. G-5.) Rosemarin went to the Marlboro Police Department, which was four miles away, and spent an hour with the police filing a report. (*Id.*) After filing the police report, she went to Commerce Bank and spent an hour or two there. (*Id.*) Inspector Ninan testified that Ponzio recognized an issue with her account at Commerce Bank while on vacation. (Nov. 2 Hr'g Tr. 66.)[8] Ponzio informed Inspector Ninan that she had visited both her bank and the police station prior to being reimbursed for the fraud. (Nov. 2 Hr'g Tr. 67-68.) Prior to being reimbursed, Ponzio had to take two vacation days off from work and took four trips to Commerce Bank. (*Id.* at 68.)

Defendants suggest that account holders' trips to the banks and police stations are "minutia" and that a finding that such conduct rendered them victims would contravene the Third Circuit's decision in *Kennedy*. (White Mem. 9.) We disagree. As the Ninth Circuit observed in *Pham*, "[i]t should be obvious to any thoughtful observer of modern economic life that identity theft has the potential to cause those whose identities are stolen the gravest of concerns about lost funds, impaired credit, and impaired reputation." *Pham*, 545 F.3d at 722. The costs associated with Defendants' fraud had a tangible impact on these account holders' lives beyond the amount

---

[8] Both parties refer to a memorandum drafted by Inspector Ninan relating to his interview of Ponzio. (Gov't's Mem. 6 n.2; Norman Mem. 7.) Although Inspector Ninan testified about his interview of Ponzio and the memorandum he drafted in conjunction with the interview, this document was never admitted into evidence. Accordingly, we rely solely on Inspector Ninan's testimony about his interaction with Ponzio.

reimbursed. The testimony by Marcuggi and Ford and the victim impact statements introduced through Inspector Ninan constitute a showing that the individual account holders defrauded by Defendants "spent time and money seeking reimbursement." *Kennedy*, 554 F.3d at 422. We find that the expenditure of account holder time and the collateral costs associated with investigating the fraud, including the cost of gas, phone calls, and days of work and vacation that were forfeited, constitute additional harm inflicted by Defendants.

After reviewing the testimony presented at the November 2 hearing and the victim impact statements offered into evidence, we are satisfied that the Government has met its burden of proving that ten or more individual account holders suffered reasonably foreseeable pecuniary harm as a result of these offenses. While the loss suffered by these individuals may be small when compared to the amount of the fraud perpetrated on them, it is, nevertheless, an actual loss that they would not have otherwise sustained, and it is a direct result of the fraud. Accordingly, these individuals qualify as victims under § 2B1.1(b)(2).

### III. CONCLUSION

For the foregoing reasons, Defendants' offenses involved ten or more victims and the sentencing enhancement § 2B1.1(b)(2)(A) is applicable.

An appropriate Order will follow.

**BY THE COURT:**

*/s/R. Barclay Surrick*
**U.S. District Judge**